IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CT-3177-FL

THOMAS COVINGTON, JR.,          )
                               )
          Plaintiff,           )
                               )
     v.                        )          ORDER
                               )
FRANK PERRY, GEORGE T.         )
SOLOMON, and BETTY BROWN,       )
                               )
          Defendants.          )

This matter is before the court on the parties' cross motions for summary judgment (DE 56, 60), filed pursuant to Federal Rule of Civil Procedure 56. The motions were fully briefed and thus the issues raised are ripe for decision. For the reasons stated below, plaintiff's motion is GRANTED in part and DENIED in part, and defendants' motion is GRANTED in part and DENIED in part.

## STATEMENT OF THE CASE

On July 16, 2015, plaintiff, a state inmate proceeding pro se, filed the instant civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., alleging defendants failed to accommodate his requests for a specialized "halal" diet mandated by his Islamic faith. Plaintiff named as defendants Betty Brown ("Brown"), the North Carolina Department of Pubic Safety ("DPS") Chaplaincy Director; George Solomon ("Solomon"), DPS Director of Prisons; and Frank Perry ("Perry"), the Secretary of DPS. As relief, plaintiff seeks a permanent injunction requiring defendants to provide plaintiff with "halal meals," nominal and punitive damages, and costs.

On March 2, 2016, defendants filed answer and motion to dismiss. On November 15, 2016,

the court denied defendants' motion to dismiss and thereafter entered case management order governing discovery and dispositive motions practice. Following completion of the initial discovery period, the court scheduled a settlement conference before United States Magistrate Judge James E. Gates, and appointed North Carolina Prisoner Legal Services, Inc. ("NCPLS") to represent plaintiff at the conference. The settlement conference was held on October 27, 2017, but the parties were unable to resolve the matter. Thereafter, NCPLS entered general notice of appearance on behalf of plaintiff, and the court reopened discovery and set new deadlines for dispositive motions. After multiple extensions of the case management deadlines, the second discovery period closed on July 2, 2018.

On August 1, 2018, the parties filed the instant cross motions for summary judgment. Plaintiff's motion requests partial summary judgment on his claims for injunctive relief, arguing that the undisputed record evidence establishes defendants violated RLUIPA and the First and Fourteenth Amendments by failing to accommodate his requests for a halal diet. In support of the motion, plaintiff filed statement of material facts and appendix thereto, which included the following: 1) personal declarations of plaintiff, inmate Tykeem Thomas, and inmate Malcolm Pfeiffer-el; 2) DPS food and nutrition management policies and procedures; 3) Scotland Correctional Institution ("Scotland C.I.") standard operating procedures; 4) excerpts from defendants' discovery responses; 5) DPS recipes; 6) DPS food costs and menu information; 7) certain internal DPS emails; 8) DPS Religious Practices Reference Manual; 9) photographs of the Scotland C.I. kitchen; and 10) Mark Shuman's deposition transcript.

Defendants' motion seeks summary judgment on each of plaintiff's claims, on the grounds that the undisputed record evidence establishes defendants did not violate plaintiff's rights under

RLUIPA or any constitutional provisions, and that they are entitled to qualified immunity on plaintiff's damages claims. In support of the motion, defendants also filed statement of material facts and appendix thereto, which included plaintiff's "offender public information" (maintained on a DPS website), personal affidavits of defendant Brown and Kelly Harris, DPS Religious Practices Reference Manual, excerpts of Mark Shuman's deposition, and excerpts from defendants' discovery responses. The motions were fully briefed. Defendants' response to plaintiff's motion for summary judgment included second affidavit of Kelly Harris.

## STATEMENT OF THE FACTS

As both parties have moved for summary judgment, the court recounts the undisputed facts and each party's version of relevant disputed facts. In 1999, plaintiff was convicted of attempted first-degree murder, and he was sentenced a minimum term of 13 years and 7 months in DPS custody. (Offender Info. (DE 62-1)). In 2013, plaintiff was transferred to Scotland C.I., his current place of incarceration and the institution where the relevant events occurred. (Pl.'s Decl. (DE 58-1) ¶¶ 3-4). Plaintiff is a devout Muslim, who has practiced Islam since 2004. (Id. ¶ 5).

A. Halal Diet

Plaintiff believes his faith requires a halal diet. (Id. ¶ 7). The term halal in the Islamic faith means "permissible" and as used herein refers to food items that Muslims are permitted to eat. (Id.) Foods that are forbidden are known as "haram" and include pork and its byproducts, alcohol, and meat and its byproducts from animals not slaughtered according to Islamic law. (Id. ¶ 7; Defs' Disc. Resps. (DE 58-6) at 4). For non-pork meats to qualify as halal, they must come from a healthy animal that was slaughtered by having its throat cut and blood drained. (Pl.'s Decl. (DE 58-1) ¶ 8; Harris Aff. (DE 62-4) ¶ 10). Muslims are permitted to eat all foods that are not prepared using

3

haram products and that have not been contaminated during preparation with haram products. (Pl.'s Decl. (DE 58-1) ¶¶ 10-11; Defs.' Disc. Resps. (DE 58-6) at 25). Plaintiff believes that consuming any haram food is a profound sin that is repugnant to his faith. (Pl's Decl. (DE 58-1) ¶ 10).

Plaintiff's faith does not require that he eat meat. (Id. ¶ 11). Plaintiff thus acknowledges that he can eat vegan or vegetarian meals, so long as such meals are not contaminated by haram products, though he would strongly prefer to eat halal-certified meats. (Id.)

B.    DPS Religion and Diet Policies

DPS's food and nutrition policy provides for specialized diets for members of certain religious groups, which include kosher, vegan, and a non-meat alternate. (DPS Food & Nutrition Mgmt. Policies & Procedures (DE 58-4) at 24). With respect to kosher food, the policy provides that "[f]oods provided, except fresh fruits, fresh vegetables and commercially prepared fluid milk, are certified by a recognized Orthodox Standard such as 'U', 'K', or 'CRC'. No pork or pork derivatives are used. Dairy is not served in the same meal as meat, chicken or fish." Id. The policy also imposes certain requirements designed to avoid contamination of kosher foods, including using separate equipment and kitchen utensils for kosher meals, washing kosher utensils before non-kosher utensils, storing kosher meals and utensils separately from non-kosher items, and special training for food workers preparing kosher foods. (Id. at 26-30). Kosher meals are only available to inmates who are validated[1] as Jewish, Hebrew Israelite, or members of the House of Yahweh or Assemblies of Yahweh. (Id. at 26; Harris Aff. (DE 62-4) ¶ 7). At Scotland C.I., food service staff implement this policy by preparing kosher meals in a separate kitchen area known as the "kosher cage" using specially shaped and colored utensils for preparing kosher meals, and storing food in specially

_____

[1]Inmates must complete "Form DC-883 Request for Religious Accommodation" and receive approval from prison officials to obtain a kosher or other specialized diet. (Harris Aff. (DE 62-4) ¶ 8).

designated kosher areas.  (Shuman Dep. Tr. (DE 58-12) at 24-27; Scotland C.I. Photographs (DE 58-11) at 1-4).

DPS policy also provides a vegan meal option, defined as "[a] menu that excludes meat, poultry, fish, eggs, milk and their by-products."  (DPS Food & Nutrition Mgmt. Policies & Procedures (DE 58-4) at 24).  This diet is only available to validated members of Rastafarian, Buddhist, or Hindu religions.  (Id. at 25; Harris Aff. (DE 62-4) ¶ 7).  At Scotland C.I., vegan meals are prepared by inmates who receive specialized training and on a cook line separated from the regular cook line.  (Shuman Dep. (DE 58-12) at 29-31).

DPS also provides a non-meat alternate entree, defined as "[a] vegetarian entree offered as a substitute for the meat entree that may include eggs, milk and milk products.  Meat, poultry and fish are excluded."  (DPS Food & Nutrition Mgmt. Policies & Procedures (DE 58-4) at 24).  DPS refers to the non-meat alternative as the "lacto-ovo tray."  (Defs.' Disc. Resps. (DE 58-6) at 8; Harris Aff. (DE 62-4) ¶ 5).  The non-meat alternate entree does not contain any meat products and is otherwise halal-compliant.  (Harris Aff. (DE 62-4) ¶¶ 13-14).  With the exception of the meat entree, however, all food items served on the lacto-ovo tray are the same as the items provided on the regular tray.  (Defs.' Disc. Resps. (DE 58-6) at 8; Shuman Dep. Tr. (DE 85-12) at 45).  The side dishes for the lacto-ovo and regular trays are prepared on the same cook line.  (Shuman Dep. Tr. (DE 58-12) at 45).  Side items prepared with meat byproducts may be served on the lacto-ovo tray.  (See Recipes (DE 58-7)).

Muslim inmates are not permitted kosher or vegan diets and DPS does not otherwise provide them with a specialized halal diet, but they can select the lacto-ovo tray containing the non-meat alternate entree.  (Pl.'s Decl. (DE 58-1) ¶ 12; DPS Religious Practices Reference Manual (DE 58-10)

at 65; Harris Aff. (DE 62-4) ¶ 11). In 2011, defendant Brown (DPS chaplaincy director) consulted

DPS clinical chaplains Khalil Akbar and Oliver Mohammad, both of whom are Imams, concerning

dietary restrictions for practicing Muslims. (Defs' Disc. Resps. (DE 58-6) at 5). Mohammad

responded with the following email:

> Since the N.C. Department of Corrections have been mandated by the Courts to provide Kosher meals for Jewish inmates a precedence has been set. This necessitates having to reconsider Islamic diets in the [DPS] in a much broader way.
>
> It is a majority Islamic opinion that Muslim [sic] can eat Kosher meals but Halal is preferred. As more inmates request the kosher meal it is prompting Muslim inmates to now request Halal as a preference over kosher and the Non-meat Alternative Diet.
>
> Our response to these new request [sic] for Halal should be within the spirit of the precedence that has been set for Kosher meals. Care has to be taken to ensure our response keeps with the mandate of RLUIPIA [sic] (Religious Land Use Institutionalized Persons Act) Law which says we must use the least restrictive means when limiting a religious practice.

(Email from clinical chaplain Mohammad to Betty Brown and Khalil Akbar (DE 58-9) at 2).

Despite this email correspondence, the DPS Religious Practices Reference Manual provides only

that Muslim inmates "may select either a Lacto-Ovo-Vegetarian Diet or Non-Meat Alternate

Entree." (DPS Religious Practices Reference Manual (DE 58-10) at 65).

As discussed further below, defendants have not provided halal diets in part because they

believe the lacto-ovo vegetarian option provides Muslim inmates with a halal-compliant option.

(Harris Aff. (DE 64-2) ¶¶ 14-15).

C.      Scotland C.I. Food Preparation

Mark Shuman, the head food administrator at Scotland C.I., testified that Scotland's primary

concern with respect to Muslim dietary restrictions is to ensure Muslim inmates do not eat pork,

which he accomplishes by marking all dishes that contain pork on the menu. (Shuman Dep. Tr. (DE

58-12) at 57-58). Scotland C.I. also makes certain meal-plan changes to accommodate fasting during the holy month of Ramadan. (Id.) Scotland C.I. takes no additional measures to ensure Muslims receive a halal diet, and such inmates are "left to police themselves." (Id.) DPS has not considered providing halal-certified meals since at least 2012. (Harris Aff. (DE 62-4) ¶ 11; Brown Aff. (DE 62-4) ¶ 13; Defs. Disc. Resps. (DE 58-6) at 9).

DPS provides written recipes to inmate food service employees to prepare meals. (DPS Recipes (DE 58-7)). Inmates are expected to strictly follow the recipes when preparing meals. (Shuman Dep. Tr. (DE 58-12) at 13). Former inmate food service employees, however, testified that Scotland C.I. kitchen staff were permitted to add ingredients to the recipes, including chicken base and beef base, to enhance flavor. (Pl.'s Decl. (DE 58-1) ¶ 18; Thomas Decl. (DE 58-2) ¶ 17). For his part, Shuman testified that since he assumed supervisory responsibility for the Scotland C.I. kitchen, inmate workers are not permitted to deviate from the recipes, and corrections officers closely monitor the inmates to ensure they do not add extra ingredients. (Shuman Dep. Tr. (DE 58-12) at 13-14).

Certain side items served on the lacto-ovo trays contain meat products. (Shuman Dep. Tr. (DE 58-12) at 40-41). For example, three side dishes served in winter and spring of 2018 – rice pilaf, cornbread stuffing, and turnip greens – require chicken base. (DPS Recipes (DE 58-7) at 2-4). The chicken base contained in these products is not halal-certified. (Shuman Dep. Tr. (DE 58-12) at 55; Pl.'s Decl. (DE 58-1) ¶ 17). Plaintiff has consumed these side dishes "several times" in 2018, and did not know they contained haram products at the time. (Pl.'s Decl. (DE 58-1) ¶ 20). DPS records also establish that in winter and spring of 2018, these dishes were served four or five times in each five-week menu cycle. (DPS Food Costs & Menu Info. (DE 58-8) at 5-8). The side dishes

prepared with meat byproducts are not marked as containing meat, and thus plaintiff cannot differentiate which side dishes contain non-halal certified meat byproducts and which do not. (Shuman Dep. Tr. (DE 58-12) at 36-37; Pl.'s Decl. (DE 58-1) ¶ 20). Additionally, plaintiff and other inmates[2] have testified that, as recently as 2015, recipes for DPS side items "often" included non-halal certified animal byproducts, including the recipes for beans, rice, gravy, potatoes, vegetables, and pasta sauce, all of which have been served on the lacto-ovo trays. (Pl.'s Decl. (DE 58-1) ¶¶ 13-17; Thomas Decl. (DE 58-2) ¶¶ 14-15; Pfeiffer-El Decl. (DE 58-3) ¶¶ 9, 11, 13-14).

Halal food items can be "contaminated" if they come into contact with haram products. (See Pl.'s Decl. (DE ) ¶ 11; Harris Aff. (DE 62-4) ¶ 10). Neither DPS nor Scotland C.I. require anti-contamination procedures for lacto-ovo trays similar to the procedures required for kosher food. (Shuman Dep. Tr. (DE 78-12) at 57-58). Lacto-ovo trays are prepared on the same cook line as regular trays that contain haram products,[3] and the same utensils are used for both lacto-ovo side dishes and regular side dishes. (Id. at 41-43, 45). Scotland C.I. also employs "blind feeding" where inmates are not allowed to see the food as it is prepared. (Shuman Dep. Tr. (DE 58-12) at 59-60). Thus, plaintiff is not able to identify which foods have been contaminated with haram, and which remain halal. (Pl.'s Decl. (DE 58-1) ¶ 20).

Shuman testified that inmate workers in the kitchen never handle food items without gloves and are expected to change gloves whenever leaving their assigned work areas, upon finishing

---

[2]Plaintiff and inmate Thomas worked in the Scotland C.I. kitchen for brief periods in 2014 and 2015, and plaintiff has also worked at other DPS kitchens. (Pl.'s Decl. (DE 58-1) ¶ 15; Thomas Decl. (DE 58-2) ¶ 8). Inmate Pfeiffer-El worked in the Columbus Correctional Institution kitchen in 2012 and 2013, and the Harnett Correctional Institution kitchen in 1998 and 1999. (Pfeiffer-El Decl. (DE 58-3) ¶ 9). The recipes for each entree and side dish are uniform across all DPS institutions. (See DPS Recipes (DE 58-9)).

[3]The lacto-ovo entree is prepared on a separate side of the cook line, using utensils that are used only for the lacto-ovo entree. (Shuman Dep. Tr. (DE 58-12) at 46).

preparation of a food product, or before touching anything after they handled meat. (Shuman Dep. Tr. (DE 58-12) at 48-49). Plaintiff and other inmates, however, have observed cross-contamination between halal and haram food products occur in the kitchen, including because inmate workers failed to change gloves after handling haram foods, and because utensils used to cook haram foods were not thoroughly cleaned before cooking vegetarian items. (Pl.'s Decl. (DE 58-1) ¶ 19; Thomas Decl. (DE 58-2) ¶¶ 18-20). Plaintiff and the inmate declarants have not worked in the Scotland C.I. kitchen since Shuman became the food services administrator. (Pl.'s Decl. (DE 58-1) ¶ 19; Thomas Decl. (DE 58-2) ¶¶ 18-20; Shuman Dep. Tr. (DE 58-12) at 6).

D.     Harris Affidavit

Defendants filed affidavit of Kelly Harris, DPS director of food and nutrition management, in support of their motion for summary judgment. (DE 62-4). Harris is responsible for understanding dietary requirements of DPS inmates and overseeing establishment of DPS menus. (Id. ¶ 4). Harris also works with defendant Brown to create diets for inmates with religious accommodations. (Id.)

Harris testified that DPS has refused prior requests for halal diets due to cost and security concerns. (Id. ¶¶ 16-23). As to cost, Harris contacted a vendor and determined the expected cost of pre-prepared halal meal trays would be approximately $4.00 per tray, whereas the current meal trays cost $1.00 per regular tray, and $1.10 per kosher tray. (Id. ¶ 18). Harris estimates that DPS currently houses 2,149 Muslim inmates, and that at least two, and possibly three halal meal trays would be required for each Muslim inmate that requests a specialized halal diet. (Id. ¶¶ 19-20). Additionally, DPS spent approximately $36,491,010.42 on food at its prison facilities in the last fiscal year. (Id. ¶ 17).

As to security concerns, Harris testified that if DPS provided a specialized halal diet, certain inmates may "manipulate" their religious preferences in order to obtain the diet. (Id. ¶ 21). DPS also cannot provide special facilities for separately preparing halal meals at each of its correctional institutions. (See id. ¶ 22). When DPS began offering kosher meals, it observed a sharp increase in the number of inmates requesting such diets, requiring numerous transfers to DPS facilities offering kosher diets. (Id. ¶ 23). Harris testified "on information and belief" that inmates were requesting kosher diets to obtain transfers to those prisons offering kosher diets to engage in gang and other illicit "collective activity." (Id. ¶ 24). Thus, Harris posits that if DPS makes a halal diet available and provision of the halal diet requires separate facilities, certain inmates may fabricate their religious beliefs to secure transfer to a prison that offers the halal diet, where they can more easily engage in gang or other illicit group activity. (See id. ¶¶ 21-24).

E.    Administrative Remedies

Prior to filing the instant lawsuit, plaintiff filed an administrative grievance requesting DPS officials provide a halal diet. (Compl. Ex. A (DE 1-1)). DPS denied plaintiff's request, and the decision was affirmed throughout all administrative appeals. (Id.) DPS staff have not contacted plaintiff about accommodating his request for a halal diet. (Pl's Decl. (DE 58-1) ¶ 23).

DPS also maintains a religious practices committee, which considers inmate requests for religious accommodations. (Brown Aff. (DE 62-2) ¶ 9). Plaintiff did not submit an official request for a halal diet to the religious practices committee. (Id. ¶ 17).

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading" but "must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 248-49; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The nonmoving party thus "bears the burden of showing, by means of affidavits or other verified evidence, that [a] genuine dispute of material fact exists."  <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 522 (4th Cir. 2003).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Anderson</u>, 477 U.S. at 250.  Where the parties file cross motions for summary judgment, the court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law" and take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted).

B.     Analysis

1.     RLUIPA Claim

In relevant part, RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, . . . or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted); see also Holt v. Hobbs, 135 S. Ct. 853, 862 (2015) (holding prisoner established substantial burden under RLUIPA because prison regulation prohibiting half-inch beard "put petitioner to [the] choice" between punishment and violating his religious beliefs).

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Smith, 578 F.3d at 250. "'RLUIPA adopts a ... strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting Lovelace, 472 F.3d at 198 n. 8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline,

consistent with consideration of costs and limited resources." <u>Cutter</u>, 544 U.S. at 723 (quotation omitted); <u>Smith</u>, 578 F.3d at 252 (quotations omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[ ] into account any institutional need to maintain good order, security, and discipline.'" <u>Couch</u>, 679 F.3d at 201 (quoting <u>Lovelace</u>, 472 F.3d at 190); <u>see also</u> <u>Holt</u>, 135 S. Ct. at 866. While cost in some cases can be a compelling governmental interest, RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c); <u>Holt</u>, 135 S. Ct. at 860.

Defendants do not dispute that plaintiff's requests for a halal diet qualifies as a "religious exercise" under RLUIPA, or the sincerity of plaintiff's religious beliefs. Thus, plaintiff's burden is discharged by showing that failure to provide a halal diet is a substantial burden on his religious exercise. <u>See</u> 42 U.S.C. § 2000cc-1(a). Plaintiff satisfies the substantial burden test.

Plaintiff's evidence establishes (and defendants do not provide evidence to the contrary) that certain side dishes containing haram animal byproducts – cornbread stuffing, turnip greens, and rife pilaf – were served on the lacto-ovo tray approximately once per week in the winter and spring of 2018.[4] (<u>See</u> Defs' Resp. Mem. (DE 64) at 5-6; DPS Recipes (DE 58-7) at 2-4; DPS Food Costs & Menu Info. (DE 58-8) at 5-8. Additionally, plaintiff and two other inmates who worked in DPS kitchens (including at Scotland C.I.) testified that as recently as 2015 multiple additional side dishes included on the lacto-ovo tray were prepared using haram animal byproducts. (Pl.'s Decl. (DE 58-1) ¶¶ 13-17; Thomas Decl. (DE 58-2) ¶¶ 14-15; Pfeiffer-El Decl. (DE 58-3) ¶¶ 9, 11, 13-14).

---

[4]These side dishes were prepared with chicken base that is no halal-certified. (DPS Recipes (DE 58-7) at 2-4; (Shuman Dep. Tr. (DE 58-12) at 55; Pl.'s Decl. (DE 58-1) ¶ 17).

Defendants have not challenged this evidence. Plaintiff also cannot determine which foods contain haram products and which do not before obtaining his tray. (Shuman Dep. Tr. (DE 58-12) at 59-60). And perhaps most telling, defendants' "admitted" the following assertion in plaintiff's statement of material facts: "as a result of recipes for foods served to plaintiff requiring haram ingredients, other foods being contaminated with haram ingredients during prep and service, and plaintiff often having no way of knowing which foods are halal, it is often impossible for plaintiff to maintain a halal diet." (Pl.'s SOMF (DE 57) ¶ 32; Defs' Resp. Pl.'s SOMF (DE 65) ¶ 32).[5]

In light of the foregoing, based upon the undisputed facts presented in the current record, without any modification of current recipes and food preparation practices by defendants, plaintiff is therefore forced to choose between eating haram dishes, or going hungry.[6] Because plaintiff is forced to choose between violating the precepts of his religion and going hungry, DPS's policy requiring him to use the lacto-ovo diet substantially burdens his religion. Holt, 135 S. Ct. at 862; Lovelace, 472 F.3d at 187.[7]

The court also notes plaintiff is not relying on isolated errors in food preparation to establish substantial burden on his religious exercise. See Colvin v. Caruso, 605 F.3d 282, 293 (6th Cir.2010) (holding "isolated incidents" of defendants providing non-kosher foods insufficient to establish

---

[5]Plaintiff specifically raised this issue in his response to defendants' motion for summary judgment, and defendants did not file reply stating this admission was made in error.

[6]Defendant maintains that the lacto-ovo entree is halal-compliant, and that there is minimal risk for cross contamination of the entree because it is prepared on a different side of the cook line. (Defs' Mem. (DE 63) at 13-14). Defendant does not suggest, however, that plaintiff can obtain all his dietary needs by eating only the entree.

[7]By comparison, in another case in this court where a plaintiff prisoner alleged RLUIPA violations, the court held that the plaintiff failed to establish a substantial burden on his religious exercise when DPS officials refused his religious accommodation request for a vegan diet. Miles v. Guice, No. 5:13-CT-3193-FL, 2016 WL 5349743, at *10 (E.D.N.C. Sept. 23, 2016), aff'd in relevant part, vacated in part on other grounds, remanded, 688 F. App'x 177 (4th Cir. 2017). In Miles, however, the plaintiff failed to establish that eating a lacto-ovo vegetarian diet required him to eat meat byproducts. See id. As set forth above, plaintiff has made the requisite showing here.

substantial burden); <u>Abdulhaseeb v. Calbone</u>, 600 F.3d 1301, 1321 (10th Cir. 2010). Plaintiff was apparently provided haram products weekly for the entire winter and spring 2018 seasons. Plaintiff's undisputed evidence also establishes that multiple additional side dishes containing haram products were served on the lacto-ovo trays as recently as 2015.

Because plaintiff has established a substantial burden on his religious exercise, the burden now shifts to defendants to establish that the burden "is the least restrictive means of furthering a compelling governmental interest." <u>Smith</u>, 578 F.3d at 250. The test is not satisfied through advancing "broadly formulated interests" such as generalized concerns about cost or security, but "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person – the particular claimant whose sincere exercise of religion is being substantially burdened." <u>Holt</u>, 135 S. Ct. at 863 (internal quotation omitted). Accordingly, defendants must establish that failing to provide plaintiff a haram diet furthers a compelling government interest. <u>Id.</u>

Defendants argue that providing haram-certified meats to all Muslim inmates would significantly increase DPS food costs and create security issues because inmates may fabricate their religious beliefs to obtain transfer to prisons that offer halal diets. (Defs' Memo. (DE 63) at 17-18; Harris Aff. (DE 62-4) ¶¶ 16-23). As set forth above, Harris testified that ordering pre-prepared halal meal trails would cost approximately $4.00 per tray, whereas current meal trays cost approximately $1.00 per tray for the regular diet. (Harris Aff. (DE 62-4) ¶ 18). Harris also estimates that there are 2,149 inmates in DPS custody, each of whom presumably could request halal trays. (<u>Id.</u> ¶ 19-20). Harris further testified, "on information and belief," that Jewish inmates have fabricated their religious beliefs to obtain kosher diets, and thereby transfer to prisons that offer such diets. These

inmates purportedly have sought such transfers so they can engage in gang or other illicit collective activity at their new institution. (Id. ¶ 24). Harris thus suggests that if DPS provides halal diets to Muslim inmates, the same issues will occur in the Muslim inmate population.

DPS has not satisfied its burden of showing a compelling governmental interest. The security issues advanced by defendants are speculative and conclusory. Harris provides no specific examples or other documentary evidence establishing that Jewish or Muslim inmates have fabricated their religious beliefs to obtain transfers for nefarious reasons. Instead, she states in wholly conclusory fashion (and "on information and belief") that she believes certain Jewish inmates have done so. DPS cannot rely on speculative, conclusory assertions to establish a compelling governmental interest, even where such evidence is provided in an affidavit. See Smith, 578 F.3d at 252 (noting conclusory assertions in prison official's affidavit are insufficient to satisfy strict scrutiny); see also Lawson v. Singletary, 85 F.3d 502, 509 (11th Cir. 1996) ("[P]olicies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to [satisfy strict scrutiny under RLUIPA].").

Moreover, to the extent DPS does not provide halal-certified foods due to security concerns, the policy is substantially underinclusive. A prison policy is underinclusive "when it leaves appreciable damage to that supposedly vital interest unprohibited." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 529, 547 (1993). A policy that is substantially underinclusive – because it permits the prohibited conduct for some inmates but not others – cannot satisfy strict scrutiny unless the government provides an adequate explanation for the discrepancy. See Holt, 135 S. Ct. at 865-66; see also Ware v. Louisiana Dep't of Corr., 866 F.3d 263, 268-69 (5th Cir. 2017). Here, DPS provides kosher diets for Jewish inmates but does not provide halal diets for

Muslim inmates, and DPS has not explained why it can accommodate the security issues related to providing kosher diets but not the security issues related to providing halal diets.[8]

Defendants also assert the cost of providing halal diets is significantly more than kosher or regular diet trays, and thus justifies their refusal to provide halal diets. The Harris affidavit is somewhat more specific as to cost than security concerns because Harris contacted one vendor and obtained a cost estimate for providing halal-certified trays. (Harris Aff. (DE 62-4) ¶ 18). The cost issue also does render the policy underinclusive, as the cost for providing kosher meals is similar to that for providing the regular diet, whereas the cost of halal-certified meals is approximately three times greater than the cost of regular trays. (See id.)

The fundamental defect of defendants' cost argument is that it is limited to the cost of providing pre-prepared halal-certified meats. Plaintiff has acknowledged that he can maintain a halal diet by eating a vegetarian meal that is not contaminated with meat byproducts. (Pl.'s Decl. (DE 58-1) ¶¶ 10-11). The Harris affidavit does not provide a cost estimate for providing Muslim inmates a vegan meal tray,[9] which DPS already provides to Hindu, Buddhist, and Rastafarian inmates. Nor does it provide a cost estimate for providing a lacto-ovo tray not containing meat byproducts in vegetarian side dishes. See Smith, 578 F.3d at 253 (defendant must show compelling government interest specific to plaintiff's proposed alternative accommodation); Lovelace, 472 F.3d

---

[8]Defendants suggest that they were compelled to provide kosher meals after certain adverse court rulings, and thus they did not have a choice with respect to accommodating security concerns created by providing kosher diets. But that fact does not absolve defendants of the burden to explain why they can provide kosher diets without any documented security issues, but cannot provide similar accommodations for Muslim inmates who wish to maintain a halal diet. See Holt, 135 S. Ct. at 865-66.

[9]As set forth above, the vegan diet is a separate diet provided to Hindu, Buddhist, and Rastafarian inmates, which is prepared on a separate cook line and does not contain any meat byproducts. (DPS Food & Nutrition Mgmt. Policies & Procedures (DE 58-4) at 24; Harris Aff. (DE 62-4) ¶ 7). Muslims are not currently permitted to select the vegan diet, though they can select the lacto-ovo vegetarian entree with the same haram sides that other inmates receive. (Harris Aff. (DE 62-4) ¶ 11; Pl.'s Decl. (DE 58-1) ¶¶ 13-14).

at 190 (same).

But even if plaintiff were requesting only halal-certified meats (which he is not), the Harris affidavit still rests on the unsupported assumption that all Muslim inmates will request halal-certified meats. If plaintiff is the only inmate that requests halal-certified meats (or if only a limited number of Muslim inmates request them), then cost will not be an issue. And the Harris affidavit does not provide any estimate with respect to the number of inmates that may request halal-certified meats. As noted, speculative or conclusory assertions cannot sustain defendants' burden of establishing a compelling governmental interest.[10] <u>Smith</u>, 578 F.3d at 252; <u>Rich v. Sec'y, Fla. Dep't of Corr.</u>, 716 F.3d 525, 533 n.6 (11th Cir. 2013) (holding prison official's affidavit cannot establish compelling governmental interest where it is based on cost assumptions that are unsupported by the record, including assumption that all Muslim inmates would request kosher meal); <u>see also</u> <u>Holt</u>, 135 S. Ct. at 866 (rejecting RLUIPA compelling interest argument where "[a]t bottom, this argument is but another formulation of the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. We have rejected a similar argument in analogous contexts, and we reject it again today." (internal quotations and citations omitted)).

Even assuming that defendants have established cost as a compelling government interest, plaintiff is still entitled to summary judgment on his RLUIPA claim because defendants have not established that failing to provide a halal-compliant diet is the least restrictive means of furthering

---

[10]The court also notes that the absence of evidence sufficient to establish a compelling governmental interest does not create a triable issue of fact. Plaintiff has moved for summary judgment on his RLUIPA claim, and thus defendants bear the burden of demonstrating through submission of admissible evidence a genuine issue of material fact on issues for which they have the burden of proof. <u>See</u> <u>Celotex</u>, 477 U.S. at 324. As set forth above, the Harris affidavit does not "designate specific facts showing that there is a genuine issue for trial." <u>Id.</u>

that interest. "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." Holt, 135 S. Ct. at 864 (internal quotation marks and alterations omitted). To satisfy the least restrictive means test, "the government [must], consistent with the RLUIPA statutory scheme, acknowledge and give some consideration to less restrictive alternatives." Couch, 679 F.3d at 203; see also Holt, 135 S. Ct. at 864-865 (holding defendants "fail[ed] to prove that [the plaintiff's] proposed alternatives would not sufficiently serve its interests").

As set forth above, the Islamic faith does not require plaintiff to eat halal-certified meats, though he would strongly prefer to do so. (Pl.'s Decl. (DE 58-1) ¶ 11). Plaintiff can thus obtain a halal diet by eating a vegan meal or if DPS ensures that all food products served on the lacto-ovo tray are not contaminated with haram animal byproducts. (Pl.'s Memo (DE 59) at 16). Accordingly, defendants can potentially accommodate plaintiff's religious exercise by providing him the same diet they already provide to Buddhist, Rastafarian, and Hindu inmates. And as explained above, defendants have not established that providing plaintiff a vegan diet would significantly increase costs or create specific security issues. Defendants' summary judgment materials also do not establish that they have considered providing plaintiff a vegan diet. See Couch, 679 F.3d at 604 (holding defendants failed to satisfy strict scrutiny where prison official's affidavit did not show that defendants had considered plaintiff's proposed alternatives).

Defendants also argue they are entitled to summary judgment on the RLUIPA claim because plaintiff cannot establish defendants acted with the requisite intent. But establishing intent is not required where, as here, plaintiff alleges the diet policy itself violates RLUIPA and asserts the claim

against defendants in their official capacities. See Lovelace, 472 F.3d at 193-95 ("To hold defendants liable as individuals [under RLUIPA], [plaintiff] must further prove that they acted with the requisite intent."). Plaintiff's RLUIPA claim was alleged against defendants in their official capacities, based on promulgation of a policy that substantially burdens his religious exercise, and thus plaintiff is not required to establish an intentional deprivation of his RLUIPA rights.[11] See id.; Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009).

Finally, the court notes defendants submitted a supplemental affidavit from Harris in response to plaintiff's motion for summary judgment, stating animal byproducts have now been permanently removed from the recipes for turnip greens, cornbread stuffing, and rice pilaf. (Second Harris Aff. (DE 66-1)). Defendants do not argue that this affidavit moots plaintiff's claims, and so the court does not address that issue. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (noting defendants bear a "heavy burden" to establish that subsequent events moot a claim).

Based on the foregoing, plaintiff is entitled to summary judgment on his RLUIPA claim. Plaintiff has established a substantial burden on religious exercise, and defendants have failed to create a genuine issue of material fact as to RLUIPA's strict scrutiny requirements. Defendants' motion for summary judgment on the RLUIPA claim necessarily is denied, and thus the final remaining issue as to the RLUIPA claim is plaintiff's remedy. As noted, an injunction is the only remedy available under RLUIPA. See Madison v. Virginia, 474 F.3d 118, 130-31, 133 (4th Cir.

---

[11]Plaintiff's pro se complaint also asserted RLUIPA claims against defendants in their individual capacities, but plaintiff appears to have abandoned any such claims, as he fails to address them in his summary judgment briefing. Notably, Rendelman held an RLUIPA plaintiff cannot obtain monetary damages against prison officials sued in their individual capacities. 569 F.3d at 189. And plaintiff can obtain the injunctive relief he seeks by pursuing his RLUIPA claim against defendants in their official capacities. See Lovelace, 472 F.3d at 193.

2006).[12]

The parties should be provided the opportunity in the first instance to propose the form of injunctive relief. See Taylor v. Freeman, 34 F.3d 266, 269 (4th Cir. 1994) ("Even where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators."). Thus, the court DIRECTS the parties to confer and propose a joint consent order for the court's approval to accommodate plaintiff's request for a halal-compliant diet.[13] In the event the parties are not able to agree on the form of injunctive relief, the parties may submit separate proposed orders, and memoranda limited to **10 pages** in support of their respective proposed orders. These submissions – either the joint proposed consent order or separate proposed orders and accompanying memoranda – shall be filed within **30 days** of entry of this order. If the parties require additional time for these submissions, they may request extensions of this deadline.

2.     First Amendment Claim

Plaintiff also alleges defendants' failure to provide a halal diet violates his right under the First Amendment to freely exercise his religion. As relief, plaintiff requests monetary damages and injunctive relief, and asserts this claim against defendants in their individual and official capacities.

---

[12] The court notes solely for comparison purposes that a number of courts outside of this circuit have entered summary judgment in favor of prisoner plaintiffs on similar RLUIPA claims. See, e.g., Hudson v. Dennehy, 538 F. Supp. 2d 400, 412–13 (D. Mass. 2008), judgment entered, No. CIV.A.01-12145-RGS, 2008 WL 1451984 (D. Mass. Apr. 11, 2008), aff'd sub nom. Crawford v. Clarke, 578 F.3d 39 (1st Cir. 2009); Watkins v. Jones, No. 4:12CV215-RH/CAS, 2015 WL 5468648, at *3 (N.D. Fla. Sept. 15, 2015), aff'd sub nom. Watkins v. Fla. Dep't of Corr., 669 F. App'x 982 (11th Cir. 2016); Agrawal v. Briley, No. 02C6807, 2004 WL 1977581, at *15 (N.D. Ill. Aug. 25, 2004). After entering judgment, these courts either ordered the parties to submit briefing on the appropriate remedy or ordered injunctive relief directing prison officials to modify diet plans that impose substantial burden on religious exercise. Hudson, 538 F. Supp. 2d at 412-13; Watkins, 2015 WL 5468648, at *3; Agrawal, 2004 WL 1977581, at *15. As set forth above, the court will provide the parties an opportunity to submit briefing on the appropriate remedy in the first instance.

[13] Consistent with the preceding analysis, the court does not suggest a "halal-compliant diet" requires DPS to provide halal-certified meats.

(Compl. (DE 1)).

The court begins with plaintiff's First Amendment claims against defendants in their individual capacities. Defendants raise the defense of qualified immunity as to this claim. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when 1) the plaintiff has not demonstrated a violation of a constitutional right, or 2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safely, 482 U.S. 78, 89–91 (1987). Additionally, to establish a violation of the First Amendment and obtain damages under § 1983, plaintiff must demonstrate defendants intentionally violated his First Amendment rights by failing to provide a halal-compliant diet. See Lovelace, 472 F.3d at 194-95.

As an initial matter, plaintiff concedes defendants Perry and Solomon are entitled to qualified immunity on plaintiff's damages claims. (Pl.'s Resp. Mem. (DE 67) at 13). As to defendant Brown,

there is no record evidence suggesting she intentionally sought to impair plaintiff's free exercise rights by refusing to provide a halal diet. In fact, plaintiff never submitted a request for a halal diet directly to defendant Brown or to the religious practices committee. (Brown Aff. (DE 62-2) ¶ 17). Where a defendant is not even aware of plaintiff's request for religious accommodation, she cannot possibly have acted intentionally to violate plaintiff's First Amendment rights. See Lovelace, 472 F.3d at 196 (affirming grant of summary judgment on plaintiff's free exercise claim where defendants were aware of plaintiff's request to participate in Ramadan but negligently failed to confirm he was eligible to participate).

Plaintiff argues that defendant Brown should be held individually liable because she was responsible for producing the Muslim diet policy that substantially burdened plaintiff's religious exercise. The allegedly unconstitutional policy is found in the DPS Religious Practices Reference Manual, which provides that Muslim inmates can select "either a Lacto-Ovo-Vegetarian Diet or Non-Meat Alternative Entree." (DPS Religious Practices Reference Manual (DE 58-10) at 65). Plaintiff alleges defendant Brown knew that Muslim inmates required halal-compliant diets, based on her communications with DPS clinical chaplains Akbar and Mohammad. As set forth above, in 2011, defendant Brown consulted Akbar and Mohammad concerning dietary restrictions for practicing Muslims. (Defs' Disc. Resps. (DE 58-6) at 5). Mohammad responded with the following email:

> Since the N.C. Department of Corrections have been mandated by the Courts to provide Kosher meals for Jewish inmates a precedence has been set. This necessitates having to reconsider Islamic diets in the [DPS] in a much broader way.
>
> It is a majority Islamic opinion that Muslim [sic] can eat Kosher meals but Halal is preferred. As more inmates request the kosher meal it is prompting Muslim inmates to now request Halal as a preference over kosher and the Non-meat Alternative Diet.

> Our response to these new request [sic] for Halal should be within the spirit of the precedence that has been set for Kosher meals. Care has to be taken to ensure our response keeps with the mandate of RLUIPIA [sic] (Religious Land Use Institutionalized Persons Act) Law which says we must use the least restrictive means when limiting a religious practice.

(Email from clinical chaplain Mohammad to Betty Brown and Khalil Akbar (DE 58-9) at 2).

Based on this email, plaintiff alleges defendant Brown "consulted with Akbar and Mohammad, who advised her that kosher or halal meals would satisfy Muslim requirements [but] defendant Brown took no other measures to determine whether a lacto-ovo meal tray would satisfy halal requirements." (Pl.'s Resp. Mem. (DE 67) at 14-15). There is no record evidence suggesting defendant Brown failed to take "measures to determine whether a lacto-ovo meal tray would satisfy the halal diet." (Id.) In fact, both Harris (the DPS director of food and nutrition management) and defendant Brown testified they believed the lacto-ovo diet complied with halal requirements.[14] (Brown Aff. (DE 62-2) ¶ 12; Harris Aff. (DE 62-4) ¶ 13). Nor can defendant Brown's alleged intent to burden plaintiff's religious exercise be inferred from the presence of animal byproducts in certain side dish recipes served on lacto-ovo trays, particularly where there is no evidence defendant Brown was responsible for developing the recipes for rice pilaf, cornbread stuffing, or turnip greens.

But even if plaintiff's assertion were supported by the record, the most that can be said is defendant Brown negligently failed to confirm the lacto-ovo diet was halal-compliant. As set forth above, plaintiff cannot establish a First Amendment individual capacity claim based on negligent conduct.[15] See Lovelace 472 F.3d at 196. Accordingly, defendant Brown is entitled to qualified

---

[14]Defendant Brown was not deposed, and so there is no record evidence specifically disputing these statements.

[15]The court notes defendants raised the intent issue primarily with respect to plaintiff's RLUIPA claims. (Defs' Mem. (DE 63) at 16). In response, however, plaintiff acknowledged that "a defendant's intent is relevant to whether a plaintiff may recover damages under Section 1983 . . . ." (Pl.'s Resp. Mem. (DE 67) at 7). Thus, plaintiff was on notice that he must demonstrate intent to establish a First Amendment damages claim. Additionally, in response to defendants'

immunity on plaintiff's First Amendment damages claim because the undisputed record evidence fails to establish a constitutional violation.

As noted, plaintiff also attempts to bring his First Amendment claim against defendants in their official capacities. (Compl. (DE-1) § III). In his summary judgment briefing, however, plaintiff states he is not pursuing damages against defendants in their official capacities. (Pl.'s Resp. Mem. (DE 67) at 15). Additionally, to the extent plaintiff is pursuing a claim for injunctive relief against defendants in their individual or official capacities under the First Amendment, the claim is entirely duplicative of the RLUIPA claim because plaintiff requests the same form of injunctive relief (provision of a halal-compliant diet) under both provisions. See Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) ("Courts should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case."). As set forth above, the court has granted plaintiff's motion for summary judgment as to the RLUIPA claim and the parties have been directed to file proposals for providing plaintiff a halal diet. Thus, plaintiff's First Amendment claim is dismissed as moot to the extent it is asserted against defendants in their official capacities and to the extent it seeks injunctive relief already provided under RLUIPA.

3.      Equal Protection Claim

The Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." City of

---

motion for summary judgment on the issue of punitive damages, plaintiff argues the record evidence set forth above establishes defendant Brown "intentionally crafted and maintained a policy that is intentionally indifferent to incarcerated Muslims' right to a religiously adequate diet." (Pl.'s Resp. Mem. (DE 67) at 15-16).

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Generally, in order to establish an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. If a plaintiff makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotation omitted); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

Plaintiff argues he has established a violation of the Equal Protection Clause because the "DPS policy imposes stringent measures to accommodate the religious dietary requirements of Jew[ish], Hindu[], Buddhist[], and Rastafarian[] [inmates]. Muslims, however, may only have the regular prison diet and are otherwise left to police themselves." (Pl.'s Resp. Mem. (DE 67) at 13 (internal quotation omitted)). As with the First Amendment claim, the equal protection claim is asserted solely against defendant Brown in her individual capacity.

For the reasons set forth in the court's discussion of the First Amendment claim, there is no record evidence establishing defendant Brown's adoption of the Muslim diet policy constituted intentional discrimination against Muslims. Defendant Brown at most negligently failed to ensure the lacto-ovo diet as halal-complaint. See Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 815-16 (8th Cir. 2008) (affirming grant of summary judgment on equal protection claim based on failure to provide Halal diet because plaintiff failed to establish policy was adopted as a result of intentional discrimination). Plaintiff also has not demonstrated that he is similarly situated to Jewish inmates who receive kosher meals, or Buddhists, Hindu, or Rastafarian inmates that receive vegan meals. See Long v. Vaughan, 652 F. App'x 176, 178 (4th Cir. 2016). Accordingly, plaintiff's evidence

does not establish an equal protection violation and defendant Brown is entitled to qualified immunity.

As noted, plaintiff concedes that defendants Perry and Solomon are entitled to qualified immunity on the equal protection claim, and that he is not pursing damages claims against defendants in the official capacities. And to the extent plaintiff seeks injunctive relief under his equal protection claim, the relief sought has been provided in connection with plaintiff's RLUIPA claim.

    4.    Punitive Damages

Defendants also have moved for summary judgment on plaintiff's request for punitive damages. As plaintiff acknowledges, a claim for punitive damages under § 1983 requires a showing that "defendant's conduct [was] motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983). For the reasons set forth above, plaintiff has not made this showing as to defendant's Brown's conduct in promulgating the Muslim diet policy. Plaintiff's request for punitive damages also is not premised on any conduct by defendants Perry or Solomon. Accordingly, defendant's are entitled to summary judgment on plaintiff's request for punitive damages.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 60) is GRANTED in part and DENIED in part. Defendants' motion is granted as to plaintiff's § 1983 First Amendment and equal protection claims, and such claims are dismissed with prejudice. The motion is also GRANTED as to plaintiff's request for punitive damages. The motion is DENIED as to plaintiff's RLUIPA claims.

Plaintiff's motion for summary judgment (DE 56) is also GRANTED in part and DENIED in part. The motion is granted as to plaintiff's RLUIPA claim, and the parties are DIRECTED to provide a joint proposed consent order or individual proposed orders as set forth above within **30 days** of entry of this order. Plaintiff's motion for summary judgment is DENIED in all other respects.

Upon entry of the injunction, the court intends to enter final judgment in this case, unless the parties demonstrate to the court that further proceedings are necessary before entering judgment.

SO ORDERED, this the 15th day of October, 2018.


LOUISE W. FLANAGAN
United States District Judge